FILED

January 12 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0278

DA 14-0278

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 6

WESTCHESTER SURPLUS LINES INSURANCE COMPANY,

        Plaintiff and Appellant,

    v.

KELLER TRANSPORT, INC.; WAGNER ENTERPRISES, LLC;
THOMAS F. JONES and RITA A. JONES, husband and wife;
DEBRA L. SYKES; RONALD L. KOHLER
and BARBARA J. KOHLER, husband and wife;
and DENNIS A. ARNOLD and GERALDINE N. ARNOLD,
husband and wife,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
                  In and For the County of Missoula, Cause No. DV-10-1133
                  Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Jonathan D. Hacker (argued), O'Melveny & Myers LLP; Washington,
                District of Columbia

                Allan H. Baris, Moore, O'Connell & Refling, P.C.; Bozeman, Montana

                Robert J. Slavik, Cozen O'Connor; Seattle, Washington

        For Appellee Debra L. Sykes:

                Trent N. Baker, Datsopoulos, MacDonald & Lind, PC; Missoula, Montana

        For Appellees Tom and Rita Jones, Ronald and Barbara Kohler, and Dennis and
        Geraldine Arnold:

                Roger M. Sullivan (argued), McGarvey, Heberling, Sullivan & Lacey, PC;
                Kalispell, Montana

                Timothy M. Bechtold, Bechtold Law Firm, PLLC; Missoula, Montana

Alan J. Lerner, Lerner Law Firm; Kalispell, Montana

For Amici Montana Trial Lawyers Association:

John L. Amsden, Justin P. Staples, Beck & Amsden, PLLC; Bozeman, Montana

_____

Argued:  September 11, 2015
Submitted:  September 16, 2015
Decided:  January 12, 2016

Filed:

Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 Westchester Surplus Lines Insurance Company (Westchester) appeals from orders entered by the Fourth Judicial District Court, Missoula County, in this declaratory action that granted summary judgment against Westchester and in favor of its insureds, Keller Transport, Inc. (Keller), and Wagner Enterprises, LLC (Wagner). We affirm in part and reverse in part. We address the following issues on appeal:

*1. Did the District Court err by determining that Westchester's policy was ambiguous and that it provided an additional $4 million in coverage under the "general aggregate" limit?*

*2. Did the District Court err by holding that Westchester breached its duty to defend the insureds under its policy?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 In April 2008, Keller leased a tanker truck from Wagner to transport gasoline to Kalispell, Montana. On Highway 35, adjacent to Flathead Lake, the truck's trailer traveled off the road, overturned, and spilled 6,380 gallons of gasoline. The gasoline flowed underneath the highway and beneath several homeowners' (Homeowners) properties.

¶3 Keller and Wagner were both insured under a Commercial Transportation Policy issued by Carolina Casualty Insurance Company (CCIC), which provided two distinct coverages: commercial automobile (Auto), and commercial general liability (CGL). The stated limit for the Auto coverage was $1 million per accident, while the stated limit for the CGL coverage was $1 million for each occurrence, as well as a $2 million "General

3

Aggregate." The CGL provisions stated that its "General Aggregate" limit was the most that would be paid under the CGL coverage regardless of the number of insureds or persons making claims. CCIC's policy stated that CCIC had the duty to defend its insureds against any lawsuit that might implicate the policy, but that such duty terminated when the coverage limits had "been exhausted by payment of judgments or settlements."

¶4     Westchester insured both Keller and Wagner under an excess liability policy, which covered those losses exceeding the coverage limits of CCIC's policy. Stated limits of the Westchester excess policy were $4 million for each "occurrence" as well as a $4 million "General Aggregate." The term "General Aggregate" was not defined. The Westchester policy incorporated the CCIC policy, stating, "[e]xcept as otherwise stated herein, and except with respect to (1) any obligation to investigate or defend any claim or suit, or (2) any obligation to renew, the insurance afforded by this policy shall apply in like manner as the underlying insurance described in the Declarations." The Declarations in turn referenced the coverages of the CCIC policy. Regarding the duty to defend, the Westchester policy stated that Westchester "shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company."

¶5     The Westchester policy contained a federally-mandated endorsement, known as the "MCS-90," as a protection for third parties injured in motor carrier vehicle accidents. The MCS-90 endorsement was created by the Motor Carrier Act of 1980 as a means to

4

guarantee recovery for injured third parties when insurance coverage was lacking. The MCS-90 required Westchester to pay up to the prescribed limit for each motor carrier vehicle accident regardless of whether covered by the policy. The insured motor carrier may be required to reimburse the insurer for any payout the insurer would not otherwise have been obligated to make. The MCS-90 attached to Westchester's policy stated "[t]his insurance is excess and the company shall not be liable for amounts in excess of $4,000,000 for each accident in excess of the underlying limits of $1,000,000 for each accident."

¶6     Following the accident, CCIC initiated payments for related clean-up expenses and litigation costs. Late in 2008, CCIC exhausted the $1,000,000 Auto coverage limit of its policy. Shortly before reaching the limit, CCIC notified Keller and Wagner that its duty to defend would end once the Auto coverage had been exhausted, citing the duty to defend provision of its policy. In January 2009, the Homeowners initiated suit against Keller and Wagner in the Twentieth Judicial District Court, Lake County, alleging negligence for causing the accident and in the manner that clean-up efforts had been implemented, which Homeowners asserted had caused further damage (hereinafter "the tort action."). Because the limits of its Auto coverage had been exhausted, CCIC referred the matter to Westchester. Westchester undertook defense of the suit on behalf of Kohler and Wagner pursuant to a reservation of rights, noting the provision of its policy that disavowed a duty to defend and, like CCIC, Westchester stated it would continue defending only until "the applicable Westchester Policy Limit has been exhausted." Westchester did not seek to withdraw from the defense pursuant to the reservation of

5

rights, and continued defending Keller and Wagner until December 2009, by which time it had paid $4 million in clean-up expenses and litigation costs. On the ground that the limit of its excess coverage for Auto liability had been exhausted, Westchester referred the defense back to CCIC in early 2010. Keller and Wagner did not challenge Westchester's assessment that the limits of its policy had been reached.

¶7 In response to Westchester's referral, CCIC made assurances to Keller and Wagner in February 2010 that it would continue to provide a defense despite having previously exhausted the limits of its policy's Auto coverage. CCIC's payments for defense costs resumed in May 2010. Despite the delay in re-initiation of payments, Keller and Wagner remained represented by counsel at all times.

¶8 In August 2010, CCIC initiated this action (hereinafter "the declaratory action") in the Fourth Judicial District Court, Missoula County, seeking a declaration of CCIC's and Westchester's responsibilities for Keller's and Wagner's defense and costs, naming Westchester, Keller and Wagner. Thereafter, Homeowners made a claim that the CCIC policy provided an additional $1 million pursuant to the CGL coverage, and that the Westchester policy likewise provided an additional $4 million in excess limits under the CGL coverage. On the premise that the post-rollover negligent conduct of Keller and Wagner constituted a separate occurrence under the CGL coverage, Homeowners demanded an additional $5 million to settle their claims. In response to these claims, CCIC amended its complaint in this declaratory action, seeking a ruling on whether separate CGL coverage was implicated by the Homeowners' claims in the underlying litigation, in addition to the Auto coverage. Westchester likewise sought a declaration

6

that the limit under its excess policy was $4 million in total, regardless of the coverages that applied, and that the limit had already been exhausted. CCIC and Westchester thus opposed Homeowners' contention that the policies provided an additional $5 million in coverage.

¶9 Keller and Wagner, on the premise they had been prejudiced by the delay in the re-initiation of defense payments by CCIC earlier in the year, entered settlement negotiations with Homeowners, excluding CCIC and Westchester. In January 2011, eight months after their defense payments had resumed, Keller and Wagner filed confessions of judgment in the tort action in favor of Homeowners that stipulated Homeowners had suffered $13,066,474 in damages. This amount was to be offset by $3 million that Homeowners had received from a settlement with another defendant. Keller and Wagner assigned their rights under the policies to Homeowners, who agreed to collect the remainder of the judgments "by any legal means only upon and against" CCIC and Westchester. Between them, CCIC and Westchester fully paid Keller's and Wagner's defense costs from the commencement of the underlying tort action through the entry of their confessions of judgment.

¶10 Shortly before the confessions of judgment were filed in the tort action, CCIC and Westchester moved to intervene in that case. CCIC and Westchester asserted a right to a determination establishing the reasonableness of any damages judgment, and the right to participate in that determination. The Lake County District Court issued an order stating it would not rule on CCIC's and Westchester's motion to intervene until the coverage issue had been determined in the Missoula County declaratory action.

7

¶11     All parties moved for partial summary judgment on two issues in the declaratory action:   1) whether there was additional coverage under CCIC's CGL coverage and Westchester's excess insurance, and 2) whether CCIC and Westchester had breached their duty to defend Keller and Wagner.

¶12     On the first issue, the Missoula County District Court determined that an additional $1 million in limits under CCIC's CGL coverage were implicated by Homeowners' claims.[1]   Regarding Westchester's excess policy, the District Court held that an additional $4 million was available, reasoning that the phrase "general aggregate" limit was undefined and ambiguous, and could be read as establishing a "general aggregate" limit for excess payments for each coverage in the underlying policy, rather than only establishing a "general aggregate" limit for the entire policy.   Regarding the second issue, the District Court held that CCIC and Westchester had both breached their duties to defend.   Regarding Westchester, the District Court held that Westchester had assumed a duty to defend, despite the language disavowing a duty in its policy, by engaging to pay Keller's and Wagner's defense costs, and, in light of the court's determination that an additional coverage amount was available, had violated that duty by withdrawing from the defense before such additional amounts were expended.

¶13     Westchester filed a Rule 60(b) motion, seeking reconsideration of the District Court's rulings on coverage and the duty to defend.   Homeowners then filed a second motion for partial summary judgment, seeking a determination from the court that the

---

[1] Homeowners and CCIC have settled all claims and the District Court's decision regarding the CCIC policy is not before the Court.

8

stipulated damages were reasonable, and that Westchester was required to pay the judgments of $13,066,477, less the $3 million Homeowners had received in another settlement, but in addition to the $4 million Westchester had already paid. The District Court denied Westchester's Rule 60(b) motion, slightly altering its first order granting summary judgment to Homeowners. The District Court held that Westchester's policy was not only ambiguous on its face, but particularly so in light of the MCS-90 endorsement attached to the policy. The District Court reasoned that because the MCS-90 endorsement stated that Westchester was not liable for amounts in excess of $4 million "for each accident," this statement conflicted with the $4 million "general aggregate" limit, and required resolution in favor of the insured. The District Court rejected Westchester's arguments on the duty to defend and reaffirmed its ruling that the duty had been breached, and that Westchester was liable for the stipulated judgments. The District Court granted Homeowners second motion for partial summary judgment, ruling that Westchester was not entitled to a reasonableness hearing, but that undisputed facts raised to the court in the summary judgment hearing were sufficient to establish that the stipulated judgments were reasonable as a matter of law.

¶14 Westchester appeals the orders granting summary judgment to Homeowners on the interpretation of the policy, the duty to defend, and denial of a hearing on the reasonableness of the stipulated damages.

## STANDARD OF REVIEW

¶15 We review the interpretation of insurance contracts de novo. *Tidyman's Mgmt. Servs. v. Davis*, 2014 MT 205, ¶ 13, 376 Mont. 80, 330 P.3d 1139.

## DISCUSSION

¶16    *1. Did the District Court err by determining that Westchester's policy was ambiguous and that it provided an additional $4 million in coverage under the "general aggregate" limit?*

¶17    The parties both acknowledge that the $4 million "general aggregate" limit in the Westchester policy represents a maximum dollar liability. The disagreement, and alleged ambiguity, concerns the question: to what does this maximum apply? According to Westchester, the term "general aggregate" is commonly used in policies and means the maximum that applies to all coverages under the entire policy. According to Homeowners, because the term was undefined in the policy, and given the structure of the excess and underlying policies here, the maximum must apply individually to each of the underlying coverages, or at least create an ambiguity that makes it so. We agree with Homeowners.

¶18    We first dispense with the notion the MCS-90 endorsement is a basis to conclude the policy is ambiguous. The federally-mandated MCS-90 endorsement is a surety provision, not a modification of the policy to which it is attached. *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 878 (10th Cir. 2009) ("The insurer's obligation under the MCS-90 endorsement [is] one of a surety rather than a modification of the underlying policy."). It operates as a safety net to protect the public when coverage for motor carrier vehicle accidents is lacking. *Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 283 (1st Cir. 1995). The MCS-90 obligates an insurer to guarantee a source of coverage for third parties injured by a negligent motor carrier, but only after it is determined that (1) the policy to which the endorsement is attached does not otherwise provide coverage

10

and (2) either no other insurer is available to satisfy the judgment against the motor carrier, or the motor carrier's insurance coverage is insufficient to satisfy the federally-prescribed minimum levels of financial responsibility. *Yeates*, 584 F.3d at 878. The language of the endorsement demonstrates that it is not intended to affect the terms of the policy's coverage: "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." Further, because a court must first determine whether the policy provides coverage before considering the applicability of the MCS-90, the endorsement necessarily is not a part of the policy for interpretational purposes. The District Court erroneously considered the provisions of the MCS-90 in analyzing the coverage question at issue here.

¶19 The terms in an insurance contract are to be interpreted according to their common sense meaning, viewed from the perspective of a reasonable insurance consumer. *Am. States Ins. Co. v. Flathead Janitorial & Rug Servs.*, 2015 MT 239, ¶ 12, 380 Mont. 308, 355 P.3d 735. A policy provision is ambiguous when, in light of the contract as a whole, it is reasonably susceptible to two different interpretations. *Farmers Alliance Mut. Ins. Co. v. Holeman*, 1998 MT 155, ¶ 25, 289 Mont. 312, 961 P.2d 114; *Fisher v. State Farm Mut. Auto. Ins. Co.*, 2013 MT 208, ¶ 15, 371 Mont. 147, 305 P.3d 861. Because insurers draft the language of insurance contracts and the object of an insurance contract is to give protection to the insured, we construe ambiguous provisions "against the insurer and in favor of extending coverage." *Fisher*, ¶ 15 (citation omitted).

11

¶20    "Item 5" of Westchester's Policy Declarations addresses "Underlying Insurance" and states "See Schedule A – Schedule of Underlying Insurance."  In turn, Schedule A sets forth the coverages and financial limits of the coverages within the underlying CCIC policy that was issued to Keller and Wagner:

**SCHEDULE A – SCHEDULE OF UNDERLYING INSURANCE**

| (A) Automobile Liability | "Bodily Injury" & "Property Damage" Combined Single Limit | | Carolina Casualty Insurance Co. 02/15/08 - 02/01/09 |
|---|---|---|---|
| | $1,000,000 | Each Occurrence | |
| (B) Commercial General Liability | $1,000,000 | Each Occurrence | Carolina Casualty Insurance Co. |
| | $2,000,000 | General Aggregate | 02/15/08 - 02/01/09 |
| | ( ) Per Project/Location | | |
| | $2,000,000 | Products/Completed Operations Aggregate | |
| | $1,000,000 | Personal & Advertising Injury | |

¶21    Item 6 of the Westchester Declarations addresses "Limits of Insurance," as follows:

**LIMITS OF INSURANCE**

$4,000,000 Each Occurrence; $4,000,000 General Aggregate
$4,000,000 Products/Completed Operations Aggregate excess of the limits indicated in Item 5 of the Declarations.  [Underlining in original.]

¶22    The District Court reasoned that, given that Schedule A makes clear that the Westchester policy provides excess insurance for both the Auto and CGL coverages, and that Item 6 makes clear there is a $4 million aggregate limit on *something*, a reasonable insurance consumer might draw two different, but plausible, interpretations.  On one hand, the $4 million general aggregate limit might represent the maximum liability of the entire excess policy, so that $4 million exhausted under one coverage would mean there

was nothing available under the other coverage. On the other hand, the $4 million general aggregate limit might represent the maximum liability under each coverage, so that $4 million exhausted under one coverage had no bearing on the limits available under the other coverage. The District Court stated that Westchester's failure to define "general aggregate" makes one no more plausible than the other.

¶23 The District Court correctly noted that the fundamental interpretational problem is caused by Westchester's failure to define the term "general aggregate" in a policy that provides excess coverage for an underlying policy with more than one coverage and more than one stated limit.[2] A reasonable consumer is faced with applying the "follow-form"[3] language of the excess policy: "the insurance afforded by this policy shall apply in like manner as the underlying insurance described in the Declarations." The phrase "in like manner" creates an apparent symmetry between the two policies that supports Homeowners' ambiguity argument. Schedule A lists two aggregates under the CGL coverage of the CCIC policy, including "GENERAL AGGREGATE ( ) PER PROJECT/LOCATION" and "PRODUCTS/COMPLETED OPERATIONS AGGREGATE" (PCO), and lists the amount of $2 million for each of these aggregates within a column headed with the oxymoronic "COMBINED SINGLE LIMIT." The Auto coverage contains only the term "occurrence," with no reference to an "aggregate," and lists a "Combined Single Limit" of $1 million. A reasonable consumer attempting to

---

[2] Notably, CCIC's insurance policy defined the term "general aggregate" as used for its policy.

[3] *See Olin Corp. v. American Home Assurance Co., et al.*, 704 F.3d 89, 93-94 (2d. Cir. 2012) ("Each policy also 'follows form' to lower-level excess policies, which means that it adopts their terms and conditions.").

13

apply the excess insurance "in like manner" could reasonably conclude that the Limits of Insurance stated in Item 6 of the excess policy are meant to correspond to the identically stated counterparts in Schedule A. Thus, the $4 million "General Aggregate" and $4 million "PCO Aggregate" are applicable only to the CGL coverage because that is the only coverage for which those terms are used in the underlying insurance stated in Schedule A. Then, the "$4,000,000 Each Occurrence" stated in the excess policy's Limits of Insurance provision would likewise appear to correspond to the Auto coverage's "$1,000,000 Each Occurrence" stated in Schedule A. Under this reasonable, logical reading, a consumer could expect to have $4 million in excess insurance per occurrence under the Auto coverage, with no aggregate, and $4 million in excess insurance, with a $4 million aggregate, under the CGL coverage, or a total of $8 million in excess limits for the two coverages in this case.

¶24    Westchester cites *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 123 (Wash. 2000), and similar authority, for the proposition that, because the term "general aggregate" as used in the excess policy is not expressly tied to a specific coverage, it must convey the total limit of excess coverage for the entire underlying policy. However, reliance on *Weyerhaeuser* is flawed here. First, it should be noted that we look to the four corners of a contract to ascertain the parties' intent, because context can provide meaning. *K&R P'ship v. City of Whitefish*, 2008 MT 228, ¶ 26, 344 Mont. 336, 189 P.3d 593. Therefore, the manner in which the *Weyerhaeuser* policy applied its aggregates is not necessarily relevant or instructive to the manner in which the Westchester policy is applied. But, further, the *Weyerhaeuser* policy was well-defined

14

and left no confusion regarding the applicability of the aggregate limits. It avoided the confusion present here by explicitly identifying the underlying coverages that had aggregate limits, leaving little ambiguity that the named coverages had aggregate limits while the unnamed coverages did not. *See Weyerhaeuser*, 15 P.3d at 123 (finding policy language unambiguous). The *Weyerhaueser* Court could quite confidently state that the application of the aggregate limit was unambiguous due to the precision of the policy language. In contrast, the Westchester policy does not define the term "general aggregate" or give any explicit indication as to how its "general aggregate" limits are to be applied.

¶25 We conclude that Westchester's policy with regard to application of the general aggregate is ambiguous because, taken as a whole, it is reasonably susceptible to at least two interpretations. Such an ambiguity must be construed in favor of coverage. *Fisher*, ¶ 15. Therefore, we affirm the District Court's holding that Westchester's policy provides an additional $4 million in CGL coverage.

¶26 "[T]he contractual duty to indemnify is breached when an 'insurer has wrongfully refused to provide coverage to an insured.'" *State Farm Mut. Auto. Ins. Co. v. Freyer*, 2013 MT 301, ¶ 27, 372 Mont. 191, 312 P.3d 403. Westchester incorrectly interpreted its policy and therefore breached its duty to indemnify Keller and Wagner to the proper limits of its policy. "[A]n insurer's wrongful refusal to indemnify entitles its insured to recover consequential damages," including attorney fees. *Freyer*, ¶ 42. Homeowners requested and were granted these damages by the District Court, and we likewise affirm that award.

¶27 *Did the District Court err by holding that Westchester breached its duty to defend the insureds under its policy?*

¶28 Westchester argues at length that its policy did not impose a duty to defend, but nonetheless acknowledges that it agreed to pay for Keller's and Wagner's defense upon exhaustion of CCIC's primary coverage limits "until the limits of [Westchester's] excess policy were exhausted," under a reservation of rights. It further argues that once its "policy limits were exhausted, the [tort] proceeding would no longer 'involve the company'" as that term is used in Condition E of the policy, and at that point Westchester "was unambiguously authorized to withdraw." Given Westchester's assumption of the defense by agreement until the policy limits were exhausted, and our holding above that additional policy limits were implicated by Homeowners' claims, we hold that Westchester had a continuing duty to defend its insureds herein, and decline to further address Condition E regarding Westchester's options in undertaking a defense. We thus turn to the question whether Westchester breached that duty to defend.

¶29 Homeowners argue that Westchester breached its duty by withdrawing from the defense before the additional policy limits were exhausted because that created a delay in defense payments that prejudiced Keller's and Wagner's defenses. Westchester argues that it did not breach the duty because the insureds continued to be represented by counsel at all times, Westchester and CCIC paid all of the insureds' defense costs through the entry of the confessional stipulated judgments, including for expert witnesses, and the stipulated judgments were entered long after any delay in defense payments. For the reasons set forth below, we agree with Westchester.

16

¶30 "Where the insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Lee v. USAA Cas. Ins. Co.*, 2004 MT 54, ¶ 19, 320 Mont. 174, 86 P.3d 562 (citing *Independent Milk & Cream Co. v. Aetna Life Ins. Co.*, 68 Mont. 152, 216 P. 1109 (1923)). The *Independent Milk* rule has been reiterated by this court multiple times in more recent years. *See Lee*, ¶ 19; *Tidyman's*, ¶ 25; and *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 20, 321 Mont. 99, 90 P.3d 381. Although we are unaware of a Montana case where this rule has been applied to an insurer that voluntarily assumed a duty to defend, other jurisdictions have done so. *See Bluestein & Sander v. Chi. Ins. Co.*, 276 F.3d 119, 122 (2nd Cir. 2002); *United Pac. Ins. v. Pac. Nw. Research Found.*, 593 P.2d 1278, 1280 (Or. App. 1979); *Ging v. American Liberty Ins. Co.*, 423 F.2d 115, 120 (5th Cir. 1970). We find these authorities persuasive, and hold that *Independent Milk* applies to a breach of an assumed duty to defend.

¶31 At the time Westchester withdrew from Keller's and Wagner's defense, there had been no suggestion that additional coverage was implicated by Homeowners' claims. Indeed, Keller and Wagner, although desiring that Westchester would continue to provide a defense, also understood that Westchester's policy limits had been exhausted. Homeowners' claim for additional coverage came eight months later, after CCIC had initiated this declaratory action for a determination of CCIC's and Westchester's respective duties, which Westchester joined. Unlike *Tidyman's*, where the insured confessed judgment during a time his insurer declined to provide a defense, *Tidyman's*, ¶ 9, Wagner and Keller were not declined a defense. Although there was a short delay in

17

payments after the defense was tendered back by Westchester, CCIC promptly agreed to provide a defense and re-initiated payments. All defense expenses incurred up to the entry of the stipulated judgments were paid. It was some eight months after defense payments *resumed* that Keller and Wagner confessed judgment. They were continually represented by counsel up to that point, evidenced by their counsel's numerous filings in the underlying action, even during the period of delayed payment.

¶32 Homeowners argue the delay in defense payments hindered Wagner's efforts to retain experts, but the record reveals that this was a matter of case management on the part of Wagner. Wagner waited until one month before its expert disclosure deadline in September 2010—seven months after CCIC agreed to resume its defense and four months after defense payments re-started—before asking Keller if Wagner could share Keller's experts at trial. When Keller declined, Wagner scrambled to locate its own experts in the remaining time. There is scant indication in the record that the delay in Wagner's retention of experts had anything to do with the delay in defense payments, particularly in light of the fact that Keller's experts were obtained at the insurer's expense as a defense cost. Notably, Wagner was still able to timely obtain experts, at the insurer's expense.

¶33 The stipulated judgments here were entered eight months after defense payments resumed. A defense was being provided and all defense costs were being covered. The facts of this case demonstrate that the insureds were not "improperly abandon[ed]" by their insurers and left without a defense such that they would be "justified in taking steps to limit [their] personal liability" by entering a stipulated judgment. *Freyer*, ¶ 34

18

(citations omitted); *Tidyman's*, ¶ 25 (citations omitted). The authority upon which we have relied for these principles holds that a stipulated judgment will not be enforced "against an insurer where the insurer has conceded coverage and defended its insured, and where there has been no finding of bad faith against the insurer." *Freyer*, ¶ 34 (citations omitted). Therefore, the District Court's order that Westchester is liable for the stipulated judgments must be reversed. This being so, it is unnecessary for us to address Westchester's appeal of the District Court's denial of a hearing on the reasonableness of the stipulated damages.

## CONCLUSION

¶34 The Westchester policy provides an additional $4 million in excess insurance pursuant to the CGL coverage. Westchester thus breached its duty to indemnify Keller and Wagner, and the District Court's order in this regard, including assessment of consequential damages, is affirmed. Westchester's assumed duty to defend continues at least until these policy limits are exhausted. However, Westchester did not breach the duty to defend and is not liable for the stipulated judgments. To this extent, the District Court is reversed.

¶35 Affirmed in part and reversed in part.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT

Justice Laurie McKinnon, dissenting.

¶36 The Court fundamentally errs when it fails to consider the insurance contract as a whole and the plain language of the Insuring Agreement. We have repeatedly held that when we look at an insurance contract to ascertain its purpose and intent, we will examine the contract as a whole, giving no special deference to any specific clause. *Mitchell v. State Farm*, 2003 MT 102, ¶ 26, 315 Mont. 281, 68 P.3d 703 (quotation and citation omitted).

¶37 Keller and Wagner's excess liability policy with Westchester unambiguously provides, under "Insuring Agreement," that "the Company's obligation hereunder shall not exceed the limit of liability stated in [Item] 6."[1] The limits of insurance are determined by Item 6, rather than Item 5 as the Court erroneously concludes. Item 6, as contrasted with Item 5 relating to "underlying insurance," clearly provides that the "limits of [Westchester's] insurance" is "$4,000,000 Each Occurrence; $4,000,000 General Aggregate." Item 6 is again referenced as setting the upper limits of insurance in the "Appeals" section of the Westchester policy, which unambiguously provides "but in no event shall the liability of the company for excess loss exceed the amount set forth in [Item] 6." Item 5, relating to the schedule of underlying insurance provided by CCIC, does not conflict or render ambiguous these clear provisions of the Westchester policy, which incorporates Item 6 and thus limits Westchester's insurance to $4 million for each occurrence, not to exceed $4 million general aggregate. Nowhere in the Court's decision

---

[1] The declarations page of the Westchester policy lists the various provisions as Items while its Insuring Agreement refers to them as Declarations. For the sake of consistency, I use the term Item.

20

have we recognized or acknowledged the existence of the Insuring Agreement, which clearly incorporates the provisions of Item 6—and not Item 5—as setting the limits of insurance. The Insuring Agreement's "shall not exceed the limit" clause does not, as the Court erroneously concludes, refer to or depend on Item 5 or CCIC's coverage.

¶38 Moreover, the Court's reliance on the "follow-form" language of the Westchester policy is legally unsound and misconstrues the provisions of the policy.[2] The "follow-form" provision states that, "[e]xcept as otherwise stated herein," the CCIC policy "shall apply in like manner." This provision makes clear that where the Westchester and CCIC policies diverge, the distinct terms of the Westchester policy control. As the Westchester policy's Insuring Agreement clearly specifies policy limits that are different from those set forth in the CCIC policy, Westchester's terms apply without reference to the CCIC policy limits. The Court errs in concluding Item 5 creates an ambiguity regarding the limits of insurance, as nothing in the insurance documents incorporates Item 5 to establish the limits of insurance. The CCIC policy terms apply only where the Westchester policy terms have not provided otherwise. The incorporation of Item 6 as Westchester's limit of insurance is expressly provided for in the Westchester policy. I cannot subscribe to manufacturing an ambiguity, as the Court does, when a simple and careful review of the insurance documents does not support coverage beyond the general aggregate amount of $4 million for each occurrence.

---

[2] I agree with the Court that the federally mandated MCS-90 endorsement is a surety provision, not a modification of the policy to which it is attached. Opinion, ¶ 18.

¶39 The term "general aggregate" is unambiguous: "The aggregate dollar liability represents the insurer's maximum total dollar liability. The fact is clear both from the ordinary everyday meaning of the word aggregate, and from case law." 3 Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 11:32, 11-501 (5th ed. 2010) (italics omitted); *Weyerhaeuser*, 15 P.3d at 122 n. 5 ("An aggregate limit defines an insurer's total liability under a policy."). The word "general" means "involving or belonging to the whole of a body, group, class, or type: applicable or relevant to the whole rather than to a limited part, group, or section." *Webster's Third New International Dictionary* 944 (Philip Babcock Gove ed. 1971). The phrase "general aggregate;" therefore, clearly refers to Westchester's maximum liability for the whole insurance policy rather than individual sections of the underlying CCIC policy. Under the provisions of the Westchester policy, the plain and ordinary meaning of "general" and "aggregate" do not require that "general aggregate" be defined in order to avoid an ambiguity within the policy as the Court offers.

¶40 I dissent from our conclusion that the policy is ambiguous and that an additional $4 million in excess insurance coverage is available. As Westchester paid out $4 million in coverage before withdrawing from the defense and tendering it back to CCIC, I would not address the remaining issues.

/S/ LAURIE McKINNON

22