Justice Beth Baker delivered the Opinion of the Court.
***321 ¶1 This case arises from a stipulated settlement entered into by Roger and Carrie Peters and Draggin' Y Cattle Company, Inc. (collectively, "Plaintiffs") with Junkermier, Clark, Campanella, Stevens, P.C. ("Junkermier"). Junkermier's liability insurer, New York Marine and General Insurance Company ("New York Marine"), intervened to challenge the reasonableness of the settlement. After allowing limited discovery and holding a reasonableness hearing, the Eighteenth Judicial District Court, Gallatin County, determined that the stipulated settlement was reasonable and entered judgment against Junkermier. New York Marine appeals.
¶2 On appeal, we address whether the District Court properly found the settlement agreement reasonable when the insurer provided a defense under a reservation of rights throughout the relevant proceedings, but did not confirm coverage under the policy or file a declaratory action to determine coverage, declined to settle with Plaintiffs for policy limits, and misrepresented the policy limits.
*937 We hold on the facts of this case that the District Court improperly held that the stipulated agreement was reasonable. We reverse and remand for further proceedings consistent with this Opinion.
PROCEDURAL AND FACTUAL BACKGROUND
¶3 This is the fourth time this case has come before this Court on appeal.[1] We restate the facts applicable to the issues in this appeal.
¶4 Roger and Carrie Peters, husband and wife, own Draggin' Y Cattle Company, formerly Alaska Basin Grazing Association. The Peterses have been ranching in Montana since the 1970s. The Peterses were longtime clients of Junkermier, working directly with Larry Addink for accounting services both for themselves and for their various businesses related to their ranching and cattle operations.
¶5 In 2004, Addink advised Plaintiffs that they could structure a sale of real property to their advantage as a tax-deferred exchange pursuant to Internal Revenue Code § 1031. Addink's plan involved selling real estate owned by Alaska Basin and using those proceeds to buy other real estate owned personally by the Peterses. Attorney Max Hansen drafted the closing documents for the transaction. Hansen expressed concern to Roger Peters that the transaction would not ***322 qualify for tax deferment under § 1031 because the parties to the exchange were related-the property being purchased to replace the Alaska Basin property was owned by the principals of Alaska Basin. He wrote a letter to Addink expressing these concerns, but explained that he had not provided Plaintiffs with tax advice about the proposed exchange. He wrote that he was leaving tax advice about the transaction to Junkermier because it had structured the deal. The property sales involved in the transaction closed in January 2007.
¶6 In November 2007, Addink learned that, pursuant to a 2002 revenue ruling, the type of transaction he had structured for Plaintiffs was prohibited from qualifying for treatment as a § 1031 exchange by the related-party rule. Addink informed Junkermier of his discovery and Junkermier notified New York Marine of the possible claim against it. Junkermier did not inform Plaintiffs that the transaction would fail to qualify under § 1031 until February 6, 2008. At the February 6 meeting, Junkermier told Plaintiffs that the transaction failed to qualify because of new tax rulings that had changed the law on related parties. Junkermier explained that, due to these recent rulings, the taxes on the transaction could not be deferred and an estimated $2.5 million would be due in state and federal taxes in three weeks. Between the time Addink realized his mistake and Junkermier disclosed the tax consequences to Plaintiffs, the Peterses had taken on additional debt and closed on a deal to purchase the Mountain View Ranch. Roger Peters testified that they would not have purchased Mountain View Ranch had they known about the tax liability. Plaintiffs' expert Robert Storey opined that the tax liability had a significant negative effect on Plaintiffs' ability to retain adequate financing and operating capital to support the ranching operations and real estate financing. He opined that inability to retain adequate financing forced Plaintiffs to dramatically scale back their operations, leading to lost profits close to $8 million.
¶7 Addink and Junkermier crafted a plan to mitigate the tax consequences by seeking an extension for Plaintiffs' 2007 tax filings, restructuring various entities in order to use losses to offset the gain, and negotiating with tax authorities to settle taxes, penalties, and interest due. Addink and Junkermier continued to provide accounting services to Plaintiffs until Plaintiffs terminated the firm in April 2009. Plaintiffs terminated Junkermier after Hansen-whom Plaintiffs had hired to negotiate a tax compromise with the IRS as part of the mitigation plan-told Plaintiffs that Junkermier had misinformed them *938 about the reason the transaction failed to qualify under § 1031.
¶8 New York Marine began providing Addink and Junkermier a ***323 defense as early as 2008 against potential claims Plaintiffs could bring. As part of these efforts, New York Marine hired Patrick HagEstad to defend Addink and Junkermier. Plaintiffs filed a complaint in January 2011 against Addink and Junkermier alleging professional negligence, breach of fiduciary duty, and breach of contract. Plaintiffs' first amended complaint, filed in February 2012, included additional allegations of breach of the implied covenant of good faith and fair dealing, misrepresentation, deceit, and constructive fraud, as well as a claim for punitive damages.
¶9 Shortly after the Peterses filed their first amended complaint, New York Marine issued a reservation of rights letter. New York Marine's letter disclaimed any coverage for fraud or punitive damages. Its final paragraph stated, "nothing herein or heretofore should be construed as an admission of coverage or liability by [New York Marine], or as a waiver, estoppel or modification of any of the terms, conditions or limitations of the [New York Marine] Policy and [New York Marine] reserves all rights, remedies and defenses, legal and equitable."
¶10 Throughout the litigation, HagEstad reported to Addink, Junkermier, and New York Marine that the case was defensible and that Plaintiffs most likely would recover less than $250,000 if they succeeded in getting a verdict at trial. On June 10, 2014, Plaintiffs offered to settle all claims against Junkermier and Addink for the policy limits of $2 million in exchange for a full and final release of all claims. HagEstad advised the parties to seek independent counsel, because Plaintiffs' policy limits demand raised issues outside the scope of his representation.
¶11 Addink and Junkermier each retained independent counsel following the policy limits demand. Addink's independent counsel contacted HagEstad and informed him that Addink wanted the case settled within policy limits because Addink believed there was "significant risk" the verdict would be in excess of policy limits. Junkermier also sent a letter to New York Marine demanding that it settle the case within policy limits. HagEstad forwarded the policy limits demand to New York Marine on June 23, 2014, along with his assessment of the case. HagEstad maintained in his letter to New York Marine that he did not think the case was worth more than $250,000. HagEstad explained his views that Plaintiffs were contributorily negligent, that the taxes were not recoverable as damages, and that other claimed damages were speculative. He conceded that if Plaintiffs succeeded on the outstanding legal issues, however, "the damages could be significantly closer to those stated by Plaintiffs in their ***324 demand letter." At the time of the policy limits demand, Roger and Carrie Peters, Hansen, and Plaintiffs' damages experts had not been deposed.
¶12 New York Marine, relying on HagEstad's counsel, authorized a counteroffer of $100,000, which HagEstad offered to Plaintiffs on July 11, 2014. Plaintiffs did not respond to this counteroffer before the mediation scheduled for November 12, 2014. Shortly after New York Marine's rejection of the policy limits demand, Addink's personal counsel wrote to New York Marine requesting that it confirm that, because it had rejected the policy limits offer, it would be responsible for any excess verdict. New York Marine did not respond to the letter. Addink's counsel wrote to New York Marine again on August 20, 2014, to inform New York Marine that he would be prepared to enter into separate settlement negotiations with Plaintiffs at the court-ordered mediation to protect Addink's personal assets. New York Marine responded that it would not agree to pay any excess verdict and that if Addink entered into separate settlement with Plaintiffs without its consent Addink would be breaching the terms of the insurance contract. In early September, Junkermier's personal counsel wrote to New York Marine to encourage it to retain separate coverage counsel so that it could be properly advised as to its responsibility for any excess verdict under Montana law, having refused a policy limits demand which the insured wanted to accept.
*939 ¶13 Meanwhile, in July 2014, Plaintiffs filed their expert witness disclosure with a report from Robert Storey attached that outlined $12 million in damages, excluding emotional distress and punitive damages. After deposing Plaintiffs' damages experts, HagEstad filed motions for summary judgment on behalf of Junkermier raising issues regarding the statute of limitations, lost profits, emotional distress damages, breach of fiduciary duty and fraud claims, and tax liability damages. The District Court found that "resolution of these pending motions would have turned the value of the litigation in one direction or the other, and subjected the case to further appeal." A hearing was scheduled on these motions for November 14, 2014.
¶14 In October 2014, Plaintiffs reached out to Addink and Junkermier suggesting that the parties enter into a stipulated judgment and covenant not to execute, highlighting the $12 million in damages calculated by its experts, as well as the uncalculated emotional distress and punitive damage claims. In early November, shortly before the scheduled November 12 mediation, Plaintiffs again reached out to Addink and Junkermier to suggest that they enter into a stipulated settlement if the case was unable to settle. Plaintiffs wrote that ***325 stipulated settlements with covenants not to execute and assignments of rights are "a legitimate way for insureds to protect themselves from an excess judgment in circumstances where liability is reasonably clear and damages exceed policy limits." They further opined that an insurer's reservation of rights is "another reason that permits the defendants to enter into a stipulated judgment, assignment, and covenant not to execute." Junkermier forwarded the two letters from Plaintiffs to New York Marine and asked New York Marine to "accept responsibility for any failed negotiations" by "indemnify[ing] and hold[ing] harmless [Junkermier] from any excess verdict." None of the correspondence in the record from personal counsel to New York Marine challenged the reservation of rights letter or asked for confirmation of $2 million in coverage under the policy.
¶15 HagEstad wrote to New York Marine a week before the settlement conference that a reasonable settlement value for the case was between $100,000 and $350,000. After this letter from HagEstad, New York Marine responded to Junkermier on November 11, 2014, that its outstanding offer of $100,000 was reasonable and that it "cannot agree to accept liability in excess of policy limits, which are eroded by defense expenses. New York Marine fully understands its duties and obligations to its insured under Montana law and has acted, and will continue to act, in accord with those obligations and in the best interests of its insured." The case failed to settle at the November 12 mediation.
¶16 Immediately following the failed mediation, Addink, Junkermier, and Plaintiffs entered into negotiations that produced a stipulated settlement for $10 million. The settlement acknowledged that New York Marine "has hired defense counsel to defend the defendants against the plaintiffs' claims." But, it continued, New York Marine's "refusal to settle by paying policy limits or, in the alternative, waive policy limits, is unreasonable and constitutes bad faith and a violation of Montana's Unfair Trade Practices Act because the defendants are needlessly being exposed to the substantial likelihood of a financially ruinous excess judgment." The agreement "ends the lawsuit through the entry of a stipulated judgment, that protects the defendants through a covenant not to execute [against Addink's or Junkermier's assets], and that permits the plaintiffs to enforce the stipulated judgment against [New York Marine] through an assignment." Addink, Junkermier, and Plaintiffs signed the agreement on November 13, 2014, the day before the scheduled hearing on the outstanding motions ***326 for summary judgment.[2] The settlement was contingent on the parties requesting "a hearing to approve the stipulated judgment as fair and reasonable." If the court did not approve the stipulated judgment, the case would proceed to trial. At the time that the parties entered into the settlement agreement, trial was three weeks away. *940 ¶17 New York Marine moved to intervene in the case on December 8, 2014, to challenge the reasonableness of the stipulated settlement; the District Court granted intervention.[3] The District Court allowed limited discovery on the issue of reasonableness and held a reasonableness hearing on November 9, 2017.
¶18 In its Findings of Fact, Conclusions of Law and Order, the District Court acknowledged, "This is not a breach of the duty to defend case." It explained, however, that clear statutory directives under § 33-18-201(5) and (6), MCA, require insurers to affirm or deny coverage within a reasonable time and to settle a case in good faith. The District Court surmised that when an insurer fails to fulfill these requirements, "its abandonment of its insured is just as certain as if it has breached the duty to defend." Because it determined that New York Marine effectively had abandoned its insured, the District Court relied on Tidyman's Management Services Inc. v. Davis , 2014 MT 205, ¶ 41, 376 Mont. 80, 330 P.3d 1139 ( Tidyman's I ), to presume the pretrial settlement was reasonable and placed on the insurer the burden of proving the settlement was unreasonable. The District Court found the stipulated judgment in the amount of $10 million, in exchange for an assignment and covenant not to execute, was reasonable. It entered judgment of $10 million in favor of Plaintiffs against Junkermier.
STANDARDS OF REVIEW
¶19 We review findings of fact for clear error and conclusions of law for correctness. Abbey/Land, LLC v. Glacier Constr. Partners, LLC , 2019 MT 19, ¶ 33, 394 Mont. 135, 433 P.3d 1230 ( Abbey/Land II ). We review de novo "a district court's decision about which legal standard to apply in assessing the reasonableness of a stipulated ***327 judgment." Tidyman's Mgmt. Servs. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh , 2016 MT 201, ¶ 8, 384 Mont. 335, 378 P.3d 1182 ( Tidyman's II ).
DISCUSSION
¶20 New York Marine argues on appeal that the District Court erred in finding that the stipulated agreement was reasonable and enforceable and improperly entered judgment on the agreement because New York Marine had defended its insureds throughout the litigation in question. It challenges the District Court's conclusions that it failed to affirm coverage and failed to settle in good faith and its holding that such failures are equivalent to abandoning its insureds. New York Marine maintains that a stipulated judgment entered into without the consent or participation of the insurer is proper only when an insurer has refused to provide a defense to its insured. New York Marine maintains that the District Court erred by presuming that the stipulated settlement was reasonable under Tidyman's I .
¶21 Junkermier and Plaintiffs (collectively, "Appellees") concede that New York Marine did not violate its duty to defend. They contend, though, that New York Marine violated other duties under the insurance contract, the "constellation" of which resulted in the abandonment of Junkermier by its insurer, "just as certain as if it ha[d] breached the duty to defend." Specifically, Appellees argue that New York Marine failed to affirm coverage under the policy or to file a declaratory judgment action to determine coverage; refused to settle within policy limits when liability was reasonably clear and damages were in excess of policy limits; and misrepresented to its insureds that policy limits were eroded by defense costs. Because New York Marine effectively abandoned Junkermier, Appellees argue that Junkermier was entitled to enter into a stipulated judgment without New York Marine's consent and that the District Court properly presumed that the stipulated judgment was reasonable under Tidyman's I .
¶22 This Court has explained that "a pretrial stipulated judgment may be enforceable *941 against the defendant's liability insurer if the insurer breaches its contractual obligation to defend that insured. Under the majority view, when an insurer improperly abandons its insured, the insured is justified in taking steps to limit his or her personal liability." Tidyman's I , ¶ 25 (quoting State Farm Mut. Auto. Ins. Co. v. Freyer , 2013 MT 301, ¶ 34, 372 Mont. 191, 312 P.3d 403 ). In the Tidyman's and Abbey/Land cases, we explained that an insurer that breaches its duty to defend "will be bound by its insured's ***328 settlement and any resulting judgment so long as the settlement is reasonable and not the product of collusion." Abbey/Land II , ¶ 34. This is because a breach of the duty to defend is a material breach of the contract that relieves the insured of the reciprocal contract duty to cooperate with the insurer, Abbey/Land II , ¶ 34, and equity thus estops the insurer from denying coverage and raising other contract defenses in subsequent litigation, see Tidyman's II , ¶ 14 ; Farmers Union Mut. Ins. Co. v. Staples , 2004 MT 108, ¶¶ 27-28, 321 Mont. 99, 90 P.3d 381. In that instance "a stipulated settlement is presumed reasonable and the burden is on the insurer to rebut that presumption." Tidyman's I , ¶ 41.
¶23 Appellees allege that four separate actions of New York Marine together resulted in the abandonment of its insured and justified their negotiation of a stipulated settlement and assignment of rights in exchange for a covenant not to execute that is entitled to a presumption of reasonableness. First, Appellees challenge New York Marine's reservation of rights letter. They contend that New York Marine refused to affirm, and thus effectively denied, any coverage under the policy because the final paragraph of the letter stated that "nothing herein or heretofore should be construed as an admission of coverage or liability." Second, they maintain that this failure was compounded when New York Marine failed to file a declaratory judgment action to resolve the underlying coverage issues the reservation of rights letter raised. Third, New York Marine refused an offer to settle the case for policy limits and then refused to acknowledge that in doing so it assumed the risk of an excess verdict at trial. Finally, New York Marine misrepresented its policy limits when it wrote to Junkermier that the policy limits were "eroded by defense costs." Appellees maintain that simply providing a defense to its insured is not enough and that the insureds properly entered into a stipulated settlement, coupled with a covenant not to execute, to protect their personal assets from the risk of an excess verdict.
¶24 Appellees' arguments raise the question whether an insurer "improperly abandons its insured," justifying the insured "in taking steps to limit his or her personal liability" by entering into a confessed judgment, assignment of rights, and covenant not to execute that gives rise to a presumption of reasonableness, when the insured alleges the insurer breached contractual or statutory duties other than the duty to defend. Freyer , ¶ 34 (internal quotations omitted). Our analysis in Freyer , though answering a slightly different question, is instructive. In Freyer , the parties to a stipulated judgment sought enforcement of ***329 their settlement against the insurer. We were asked to determine whether the stipulated settlement entered into without the consent of an insurer could be the proper measure of damages in later litigation to recover for a breach of the duty to indemnify. In answering that question, we carefully distinguished between an insurer's duty to defend and its duty to indemnify. Freyer , ¶ 26. We explained that "[t]he duty to indemnify is independent of and narrower than the duty to defend." Freyer , ¶ 26. The duty to defend is triggered "when a complaint against an insured alleges facts, which if proven, would result in coverage." Staples , ¶ 21. "The broader duty to defend requires an insurer to act immediately to defend the insured from a claim. ... On the other hand, the narrower duty to indemnify typically involves complicated interpretational questions that often require legal opinions and separate declaratory actions to determine." Freyer , ¶ 37.
¶25 We held in Freyer that the stipulated judgment was not the appropriate measure of damages when an insurer has provided a defense to the insured, because the stipulated agreement could not fairly be attributed to the insurer's conduct. Freyer , ¶ 35.
*942 We explained that a stipulated judgment is presumptively enforceable as the measure of damages when the insurer has failed to defend, "because the non-defending insurer has left its insured on its own to challenge liability, and the insurer should not be able to 'reach back' and interject itself into a controversy it has sidestepped to 'void a deal the insured has entered to eliminate personal liability.' " Freyer , ¶ 35 (quoting Hamilton v. Md. Cas. Co. , 27 Cal.4th 718, 117 Cal.Rptr.2d 318, 41 P.3d 128, 135 (2002) ). In other words, if the insurer declines to provide a defense against the claims on behalf of the insured in the first instance, the insurer may not put on that defense for its own benefit in later proceedings. In contrast, "when 'the insurer has accepted the defense of the claim, and might have prevailed at trial had the insured and the claimants not settled without the insurer's participation, no presumption of the insured's liability generally arises from the fact or amount of settlement.' " Freyer , ¶ 35 (quoting Hamilton , 117 Cal.Rptr.2d 318, 41 P.3d at 135 ).
¶26 Like the duty to indemnify, the duties that Appellees raise are distinct from the insurer's duty to defend. All of the actions Appellees challenge are possible breaches of the insurance contract, violations of the Unfair Trade Practices Act ("UTPA"), or both. See § 33-18-201(1), (5), and (6), MCA.
¶27 Section 33-18-201, MCA, states in pertinent part:
A person may not, with such frequency as to indicate a general business practice, do any of the following:
***330 (1) misrepresent pertinent facts or insurance policy provisions relating to coverages at issue;
...
(5) fail to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.
Section 33-18-242(1), MCA, gives an insured an independent cause of action for its insurer's violations of these duties. A plaintiff under this section "is not required to prove that the violations were of such frequency as to indicate a general business practice." Section 33-18-242(2), MCA. The statute further provides what causes of action a plaintiff may bring when an insurer has engaged in unfair claim settlement practices:
An insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract, for fraud, or pursuant to this section, but not under any other theory or cause of action. An insured may not bring an action for bad faith in connection with the handling of an insurance claim.
Section 33-18-242(3), MCA. In addition to actual damages, a plaintiff may recover compensatory damages proximately caused by any violation of subsections (1), (5), or (6), as well as exemplary damages. Section 33-18-242(4), MCA. Further, "an insured is entitled to recover attorney fees, ... when the insurer forces the insured to assume the burden of legal action to obtain the full benefit of the insurance contract, regardless of whether the insurer's duty to defend is at issue." Mountain W. Farm Bureau Mut. Ins. Co. v. Brewer , 2003 MT 98, ¶ 36, 315 Mont. 231, 69 P.3d 652.
¶28 An insurer is not liable under the UTPA "if the insurer had a reasonable basis in law or fact for contesting the claim or the amount of the claim." Section 33-18-242(5), MCA. Such determinations are generally a question of fact. See Shilhanek v. D-2 Trucking, Inc. , 2003 MT 122A, 79 P.3d 1094 ; see also Estate of Gleason v. Cent. United Life Ins. Co. , 2015 MT 140, ¶¶ 62-63, 379 Mont. 219, 350 P.3d 349 ; Redies v. Attorneys Liab. Prot. Soc'y , 2007 MT 9, ¶ 35, 335 Mont. 233, 150 P.3d 930. An insured has the burden of proving a violation of the act to an independent fact-finder. Peris v. Safeco Ins. Co. , 276 Mont. 486, 493, 916 P.2d 780, 785 (1996). If the elements are established, the statute provides complete recovery for any injury caused by violation of the act.
¶29 In addition to allowing private rights of action for violations of ***331 certain duties expressed in the UTPA, *943 § 33-18-242(3), MCA, preserves an insured's common-law right to bring a breach of contract claim. Every insurance contract includes a covenant of good faith and fair dealing, which we have long recognized gives rise to a duty to accept a reasonable offer within policy coverage limits. Gibson v. W. Fire Ins. Co. , 210 Mont. 267, 275, 682 P.2d 725, 730 (1984). "In determining whether to settle, the insurer must give the insured's interest as much consideration as it gives its own interest." Gibson , 210 Mont. at 275, 682 P.2d at 730. An insured may recover compensatory and consequential damages for breach of this duty in a breach of contract action. Freyer , ¶¶ 31, 42-43 ; § 27-1-311, MCA.
¶30 Like in Freyer , the distinctions between when and how these duties and the duty to defend arise are important. In some cases, determining whether an insurance company violated these duties may require an analysis that looks back at what the parties knew at the time the contested actions were taken. See Shilhanek , 2003 MT 122A, 79 P.3d at 1094 ("[W]hat [the insurer] knew, and what it did in the face of that knowledge, goes to the question of whether [the insurer] had a reasonable basis for denying payment."); see also 14 Steven Pitt et al., Couch on Insurance § 200:4 (3d ed. 2007) ("[T]he duty to defend is absolute while the duty to settle is generally more discretionary."). In some circumstances, insureds can bring UTPA claims prior to the resolution of the underlying claim. Peris , 276 Mont. at 492, 916 P.2d at 784. But the insured cannot determine unilaterally that such violations occurred in order to justify a stipulated settlement that would be presumptively enforceable against the insurer in the underlying liability case or in subsequent litigation.
¶31 The facts of this case provide an illustrative example of why insureds cannot use the underlying liability case to bind an insurer to a stipulated settlement amount when they allege that the insurer failed to affirm coverage in a reasonable time. Appellees maintain that New York Marine violated the duty to affirm coverage because it explicitly failed to affirm any coverage under the policy in its reservation of rights letter and that New York Marine should have filed a declaratory judgment action to resolve the question of coverage that its letter created. On the other hand, New York Marine maintains that it reserved its rights to challenge coverage for fraud and punitive damages and did not call into question other coverage under the policy, as evidenced by its continued defense of the claims. It maintains that its reservation of rights letter created no disputes of coverage that needed to be resolved in a declaratory rights action unless fraud was ***332 found or punitive damages were awarded. The various arguments both sides make as to how New York Marine violated or did not violate the duty to affirm coverage under § 33-18-201(5), MCA, underscore the reason for a separate framework for presenting such claims in a UTPA action. Failure to file a declaratory judgment action is not abandonment of its insured in the underlying action, but could be part of an alleged violation of § 33-18-201(5), MCA.
¶32 An insured's potentially valid UTPA or contract claims do not render a pre-trial settlement and confessed judgment entered into without the consent or participation of the insurer and enforceable only against the insurer reasonable when the insurer is providing a defense. Plaintiffs argue that the constellation of an insurer's various acts in violation of UTPA duties or in breach of the insurance contract justifies the insured's unilateral action and that the District Court rightly applied the Tidyman's standard to give the settlement amount a presumption of reasonableness. Accepting this would supplant both the insured's common-law contractual remedy and the legislative remedy afforded for an insurer's unfair practices under § 33-18-242, MCA. When an insurer has not confirmed or denied coverage or has not settled in good faith, the insured has remedies, including a breach of contract action and a separate statutory remedy that includes compensatory and punitive damages and attorney fees. It is the failure to provide a defense-which is not addressed in the UTPA-that constitutes improper abandonment, justifying an insured to take steps limiting its personal liability through a settlement that the law recognizes as presumptively reasonable. See *944 Westchester Surplus Lines Ins. Co. v. Keller Transp., Inc. , 2016 MT 6, ¶ 33, 382 Mont. 72, 365 P.3d 465.
¶33 New York Marine accepted defense of the claim and provided a defense throughout the relevant proceedings. The parties strongly dispute the relative strength of their legal positions going into trial. But with the insurer providing a defense, the insureds "might have prevailed at trial had the insured and the claimants not settled without the insurer's participation." Freyer , ¶ 35 (quoting Hamilton , 117 Cal.Rptr.2d 318, 41 P.3d at 135 ). Appellees counter that if the defense had failed, Junkermier faced a potential excess verdict that would have been ruinous to the company, and it was justified in taking steps to prevent that outcome. They maintain that the stipulated agreement was the only way Junkermier could protect itself from an excess verdict after New York Marine rejected the offer to settle for policy limits. We disagree. "It is now fairly established in American jurisprudence that ***333 an insurer which in bad faith fails to settle a bona fide third party liability claim against its insured, within policy coverage limits, takes the risk of a judgment by the trier of fact in excess of the coverage limits." Gibson , 210 Mont. at 274, 682 P.2d at 730. We explained that "[t]he effect of such bad faith is to open the policy coverage limits to the extent of the trial result." Gibson , 210 Mont. at 274, 682 P.2d at 730. We have not held an insurer liable for failure to settle within policy limits "when it had a reasonable basis in law or fact for contesting coverage." Freyer , ¶ 47.
¶34 A party asserting a contract or UTPA claim bears the burden to prove the asserted breach of duty and resulting damages. See §§ 26-1-401 through -403, MCA. When an insurer breaches the duty to defend, it loses its right to invoke insurance contract defenses or to assert policy limits. Tidyman's II , ¶ 14. We presume in those cases that the settlement amount agreed to by the insured is reasonable and the insurer is bound by that amount in subsequent actions to enforce the settlement against it. Abbey/Land II , ¶ 34. A reasonableness hearing is not a trial on the merits of an insured's claims against its insurer. It is a limited procedure in which the trial court "may set parameters of the hearing[ ] and determine in its discretion whether and to what extent any further discovery is necessary prior to the hearing." Tidyman's I , ¶ 44. The insurer may challenge in a reasonableness hearing only whether the settlement amount is reasonable or the product of collusion. Abbey/Land II , ¶ 34. The objective of the reasonableness hearing is not "to further punish the insurer," Tidyman's II , ¶ 14, but to ensure that there has not been "mischief in settlement negotiations," Tidyman's I , ¶ 40. Thus, the burden of proving the element of damages in a subsequent breach of contract claim presumptively is removed from the insured or its assignees when the insurer breaches the duty to defend. The corollary, however, is that an insurer does not waive its contract defenses when an insured alleges breaches of other duties, and the same presumptions do not attach to the settlement amount. The insured or its assignees retain the burden to demonstrate by a preponderance of the evidence each element of its claim, including damages. See Freyer , ¶ 43.
¶35 Appellees' settlement agreement called for entry of a stipulated judgment for $10 million, along with a covenant not to execute "that permits the plaintiffs to enforce the stipulated judgment against the Insurer through an assignment." It further required the parties to "request the [District] Court to set a hearing to approve the stipulated judgment as fair and reasonable." Junkermier and Plaintiffs certainly ***334 were free to enter into a stipulated settlement and end the lawsuit between them. But the District Court could not find such an agreement "fair and reasonable" for purposes of presuming damages against the defending insurer in subsequent litigation through a breach of contract or UTPA claim.[4] Junkermier or its assignee *945 may not attempt, in the underlying liability case, to litigate the element of damages that it then could assert in a separate action against the insurer for alleged unfair claim practices.
¶36 The remedies available for breach of contract and for UTPA violations provide redress for any injuries Junkermier would have faced from New York Marine's allegedly improper actions. Junkermier was not powerless to protect itself without a stipulated settlement agreement presumed reasonable by the District Court. For example, before trial, Junkermier could have assigned any claim arising from the insurer's alleged violations to Plaintiffs in exchange for a covenant not to execute any resulting excess verdict against the insureds. See Hamilton , 117 Cal.Rptr.2d 318, 41 P.3d at 132. Such a claim would mature if an excess verdict was rendered. See Hamilton , 117 Cal.Rptr.2d 318, 41 P.3d at 132. Alternatively, Junkermier could have sought and paid a settlement to Plaintiffs and sought recovery from New York Marine for itself in a breach of contract or UTPA claim. Peris , 276 Mont. at 493-94, 916 P.2d at 785.
¶37 Enforcement of a judgment against New York Marine is not at issue in this case, and we express no opinion on any claims that may be brought against New York Marine in the future. New York Marine intervened to challenge the reasonableness and the entry of judgment on the stipulated settlement that could be enforced only against it. The violations that Appellees allege are not violations that the insureds unilaterally could determine occurred in order to justify entering into such a stipulated settlement.
¶38 Appellees and their Amici rely on case law from other ***335 jurisdictions approving the use of stipulated settlements whenever there is a question regarding coverage or bad faith refusal to settle a claim. Like Montana, all of the states on which Appellees and their Amici rely for this proposition have adopted some form of the Unfair Trade Practices Act from the National Association of Insurance Commissioners' model act. Unlike Montana, however, all but one of these states' Unfair Trade Practice Acts do not allow private rights of action for their enforcement.[5] ,[6] Montana's *946 Legislature has provided a ***336 statutory remedy that allows recovery of consequential and punitive damages for the violations Appellees raise. The UTPA protects insureds and third-party claimants from unfair settlement practices by insurance companies and provides express remedies to make insureds and claimants whole for a company's violation. We decline to impose as a matter of law a new obligation on a defending insurer, as suggested by Appellees, to file a declaratory judgment action before the resolution of the liability case, when the Legislature has provided an express cause of action and remedies for violations of duties expressed in the UTPA. See §§ 33-18-242, and 1-1-108, MCA ("In this state there is no common law in any case where the law is declared by statute.").
CONCLUSION
¶39 "[T]his Court has never approved a confessed judgment as the proper measure of damages where the insurer defended its insured." Freyer , ¶ 30 (internal quotations omitted).
Where, as here, the insured, without the insurer's agreement, stipulates to a judgment against it in excess of both the policy limits and the previously rejected settlement offer, and the stipulated judgment is coupled with a covenant not to execute, the agreed judgment cannot fairly be attributed to the insurer's conduct, even if the insurer's refusal to settle within the policy limits was unreasonable.
Freyer , ¶ 35 (quoting Hamilton , 117 Cal.Rptr.2d 318, 41 P.3d at 131 ). When an insurer has provided a defense to its insured, a District Court may not approve a stipulated agreement entered into without the consent or participation of the insurer that will be deemed presumptively reasonable against the defending insurer. If the third-party claimant and the insured decide to settle without the insurer's participation, a court may approve the stipulated judgment as between those parties in the underlying liability case, but it will not be presumed reasonable as to the insurer when the insurer is providing a defense. In such cases, the insured must pursue its separate breach of contract or UTPA claims against the insurer and will bear the burden of proving all elements of those claims, including damages.
¶40 The parties in this case stipulated that the settlement would not bind them unless the District Court approved it as "fair and reasonable." Because the District Court's reasonableness determination was based in part on its conclusion that a presumption of reasonableness applied, the entry of judgment must be reversed. We reverse the District Court's order and entry of judgment against Junkermier and remand for further proceedings consistent with this ***337 Opinion.
We Concur:
MIKE McGRATH, C.J.
LAURIE McKINNON, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.

Draggin' Y Cattle Co. v. Addink , 2013 MT 319, 372 Mont. 334, 312 P.3d 451 (Draggin' Y I ); Draggin' Y Cattle Co. v. Addink , 2016 MT 98, 383 Mont. 243, 371 P.3d 970 (Draggin' Y II ); Draggin' Y Cattle Co. v. Junkermier, Clark, Campanella, Stevens, P.C. , 2017 MT 125, 387 Mont. 430, 395 P.3d 497 (Draggin' Y III ).

Under the agreement, Plaintiffs moved to dismiss Addink from the case with prejudice. The District Court dismissed Addink on November 19, 2014.

In Draggin' Y III , we vacated all orders entered by Judge Huss after the grant of New York Marine's motion to intervene, because he should have recused himself from the case. Draggin' YIII , ¶ 40. This appeal addresses the proceedings before Judge Eddy after remand from our decision in Draggin' Y III .

The assignment of rights in stipulated agreements is an assignment to the plaintiff of the insured's claims against its insurer. See, e.g, Justin A. Harris, Note, Judicial Approaches to Stipulated Judgments, Assignments of Rights, and Covenants Not to Execute in Insurance Litigation , 47 Drake L. Rev. 853, 859 (1999). Thus, an insured may assign to the plaintiff any breach of contract or UTPA claims that it has against its insurer. The parties' agreement in this case, however, did not state it was assigning the insured's claims , but rather "permit[ted] the plaintiffs to enforce the stipulated judgment against the Insurer through an assignment." The language of the parties' settlement agreement demonstrates their belief that the settlement amount presumptively would be enforceable against the insurer as the damages amount in subsequent UTPA or breach of contract actions.

See Alaska Stat. § 21.36.125(b) (2018) ("The provisions of this section do not create or imply a private cause of action for a violation of this section."); Ariz. Rev. Stat. Ann. § 20-461(D) (2019) ("Nothing contained in this section is intended to provide any private right or cause of action to or on behalf of any insured or uninsured resident or nonresident of this state. It is, however, the specific intent of this section to provide solely an administrative remedy to the director for any violation of this section or rule related to this section."); Colo. Rev. Stat. § 10-3-1104(1)(h) (2018) (providing only for an administrative remedy); Farmers Grp., Inc. v. Trimble , 658 P.2d 1370, 1378 (Colo. Ct. App. 1982) (interpreting Colo. Rev. Stat. § 10-3-1104(1)(h) and explaining that "The General Assembly could have added the remedy of a private civil action for damages to its catalog of sanctions. It did not do so, however, and in the absence of any indication of contrary legislative intent, we must assume that the specific remedies designated by the General Assembly exclude all others. We conclude that this statute may not serve as the sole basis for a civil action instituted by private citizens allegedly aggrieved by the conduct of their insurers." (citations omitted)); Iowa Code § 507B.4 (2018) (not providing for a private right of action); Bates v. Allied Mut. Ins. Co. , 467 N.W.2d 255, 260 (Iowa 1991) ("To hold that chapter 507B creates a private cause of action would be in direct contradiction to existing Iowa law and would create a cause of action not intended by the legislature."); Kan. Stat. Ann. § 40-2404(9) (2019) (providing for no private cause of action); Earth Scientists (Petro Servs.), Ltd. v. U.S. Fid. & Guar. Co. , 619 F.Supp. 1465, 1471 (D. Kan. 1985) (interpreting Kan. Stat. Ann. § 40-2404(9) to "not provide a private cause of action"); Me. Rev. Stat. Ann. 24-A § 2164-D(8) (2019) ("This section may not be construed to create or imply a private cause of action for violation of this section."); Minn. Stat. § 72A.201(1) (2019) (providing for an administrative remedy); Morris v. Am. Family Mut. Ins. Co. , 386 N.W.2d 233, 238 (Minn. 1986) (interpreting Minnesota's unfair trade practice act and explaining that it "lack[s] an explicit legislative intention to create a new cause of action in derogation of our common law" and "hold[ing], therefore, that a private person does not have a cause of action for a violation of the Unfair Claims Practices Act"); 40 Pa. Cons. Stat. §§ 1171.5 and 1171.7 (2019) (providing for an administrative remedy); Wyo. Stat. Ann. § 26-13-124 (2019) ; Herrig v. Herrig , 844 P.2d 487, 494 (1992) ("[W]e hold that no implied private right of action exists under § 26-13-124 of the Wyoming Insurance Code.").

The lone exception is Washington. See Wash. Rev. Code § 48-30-015 (2019) (providing for a private right of action for unfair claim settlement practices). As we explained in Abbey/Land II , ¶ 59, however, Washington has a specific statutory process for court-approval of settlement agreements that Montana does not have. Washington law does not provide a meaningful comparison.